LAW OFFICES OF JOSHUA B. KONS, LLC
Joshua B. Kons (SBN. 244977)
939 West North Avenue, Suite 750
Chicago, IL 60642
Tel:(312) 757-2272
Fax: (312) 757-2273
Email: joshuakons@konslaw.com

*Attorney for Plaintiffs and for the Proposed Class*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LAURA ROCKE, STEPHENIE MCGURN, AND PEGGY JOHNSON, on behalf of themselves and other individuals similarly situated,<br><br>        Plaintiffs,<br><br>vs.<br><br>LLR, INC., a Wyoming Corporation, LULAROE, LLC, a California Limited Liability Company, MARK STIDHAM, DEANNE BRADY a/k/a DEANNE STIDHAM, and DOES 1 through 100, inclusive,<br><br>        Defendants. | CIVIL CASE NO.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR TRIAL BY JURY** |

## CLASS ACTION COMPLAINT

1.     Laura Rocke, Stephenie McGurn, and Peggy Johnson ("Plaintiffs") bring this nationwide class action lawsuit on behalf of themselves and all similarly situated individuals who were LuLaRoe consultants from January 1, 2013 to

present for violations of the California Endless Chain Scheme Law (California Penal Code § 327 and California Civil Code § 1689.2); the California Unfair Competition Law (California Business and Professions Code § 17200 *et seq.*); False Advertising (Business and Professions Code § 17500 *et seq.*); the California Seller Assisted Marketing Plan Act (Cal. Civ. Code § 1812.200 *et seq.*); Common Law Fraud and Misrepresentation; Unjust Enrichment; and Breach of the Implied Covenant of Good Faith and Fair Dealing, against Defendants LLR, Inc., a Wyoming Corporation, Lularoe, LLC, a California Limited Liability Company, Mark Stidham, DeAnne Brady a/k/a DeAnne Stidham, and DOES 1 through 100, inclusive (collectively, the "Defendants"), for their operation the LuLaRoe enterprise ("LuLaRoe") as a massive, nationwide pyramid scheme and for the promotion and sale of an unregistered seller assisted marketing plan, which was calculated to unjustly enrich the Defendants at the detriment of the Plaintiffs and the Class. Accordingly, Plaintiffs, for themselves and on behalf of all others similarly situated individuals allege the following.

## **PARTIES**

2.     Plaintiff Laura Rocke is and at all relevant times was an individual who resides in Reno, Nevada. Rocke executed an Independent Consultant Program Application and Agreement with the Defendants on July 2, 2016, and was

approved as a LuLaRoe consultant sometime shortly thereafter. Rocke purchased a substantial amount of products from LuLaRoe, and has suffered actual damages as a direct and proximate result of Defendants' conduct as described herein.

3.    Plaintiff Stephenie McGurn is and at all relevant times was an individual who resides in Morton, Pennsylvania. McGurn executed an Independent Consultant Program Application and Agreement with the Defendants on June 29, 2015, and was approved as a LuLaRoe consultant sometime shortly thereafter. McGurn purchased a substantial amount of products from LuLaRoe, and has suffered actual damages as a direct and proximate result of Defendants' conduct as described herein.

4.    Plaintiff Peggy Johnson is and at all relevant times was an individual who resides in Boulder City, Nevada. Johnson executed an Independent Consultant Program Application and Agreement with the Defendants on November 30, 2016, and was approved as a LuLaRoe consultant sometime shortly thereafter. Johnson purchased a substantial amount of products from LuLaRoe, and has suffered actual damages as a direct and proximate result of Defendants' conduct as described herein.

5.    Defendant LLR, Inc. is and at all material times was a Wyoming Corporation with its principal place of business in California located at 1375

Sampson Avenue in Corona, California. Although LLR, Inc. was incorporated by Defendant Mark Stidham on February 18, 2015, it did not register as a foreign entity with the California Secretary of State until January 29, 2016. LLR, Inc. transacted a substantial amount of business in California between February 18, 2015 and January 29, 2016. It is currently an active foreign entity that is authorized to transact business in California as LLR LuLaRoe, Inc. Defendants Mark Stidham and Deanne Brady are listed as currently identified as officers of this entity. At all relevant times, LLR, Inc. was doing business as LuLaRoe.

6.    Defendant Lularoe, LLC d/b/a LuLaRoe is and at all material times was a California Limited Liability Company located at 1375 Sampson Avenue in Corona, California. It was formed by Defendant Mark Stidham on January 25, 2013 as a member-managed limited liability company. Recent corporate filings with the California Secretary of State indicate that Defendant DeAnne Brady is currently the CEO of this entity. At all relevant times, LuLaRoe, LLC was doing business as LuLaRoe. At all relevant times, LLR, Inc. was doing business as LuLaRoe.

7.    Defendant Mark Stidham is an individual that at all relevant times lived in and around Corona, California. Upon information and belief, Defendant Mark Stidham is the co-founder of LuLaRoe and is currently acting CEO of LLR,

Inc. Defendant Mark Stidham is married to Defendant DeAnne Brady a/k/a DeAnne Stidham. Upon information and belief, Defendant Mark Stidham is one of the masterminds behind the LuLaRoe endless chain scheme, and was an individual that willfully violated the California Seller Assisted Marketing Plan Act.

8.      Defendant DeAnne Brady a/k/a DeAnne Stidham is an individual that at all relevant times lived in and around Corona, California. Upon information and belief, Defendant DeAnne Brady is the co-founder of LuLaRoe and is currently acting CEO of Lularoe, LLC. DeAnne Brady is married to Defendant Mark Stidham. Upon information and belief, Defendant DeAnne Brady is one of the masterminds behind the LuLaRoe endless chain scheme, and was an individual that willfully violated the California Seller Assisted Marketing Plan Act.

9.      The true names and capacities of Defendants sued herein as DOES 1 through 100, inclusive, are currently unknown to Plaintiffs, who therefore sue such Defendants by such fictitious names. Each of the Defendants designated herein as a DOE is legally responsible in some manner for the unlawful acts referred to herein, or are entities used as an alter ego for Mark Stidham and DeAnne Brady. Plaintiffs will seek leave of Court to amend this Complaint to reflect the true names and capacities of the Defendants designated herein as DOES when such identities

become known. DOES 1 through 100 were at all relevant times, primary beneficiaries and promoters of the LuLaRoe endless chain scheme.

10.     Based upon information and belief, it is alleged that at all times mentioned herein, each and every Defendant and DOE was acting as an agent of each of the other Defendants and DOES, and at all times mentioned was acting within the course and scope of said agency with the full knowledge, permission, consent and ratification of each of the other Defendants and DOES. In of addition, each of the acts and/or omissions of each Defendant and DOE alleged herein were made known to, and ratified by, each of the other Defendants and DOES.

11.     Defendants each acted individually and through its agents, employees, officers, directors, independent contractors, successors, assigns, principals, and representatives.

## JURISDICTION AND VENUE

12.     The Court has jurisdiction under the Class Action Fairness Act of 2005, 28 U.S.C. §1332(d)(2), because the suit is a class action, the parties are minimally diverse, and the amount in controversy exceeds $5,000,000, excluding interest and costs. The Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. §1367(a).

13.     This Court has personal jurisdiction over Defendants because they had sufficient minimum contacts with California and within this District because (i) Defendants LLR, Inc. and Lularoe, LLC are headquartered in this District; (ii) Defendants Mark Stidham and DeAnne Brady both reside in this District; (iii) Defendants transact a substantial amount of business in California, including within this District; (iv) Defendants LLR, Inc. and Lularoe, LLC are authorized to transact business in California; and (v) Defendants have each purposefully availed themselves of the laws and markets of this District through the promotion, sale, and distribution of their products and seller assisted marketing plans from within California and within this District.

14.     Venue is proper in this District under 28 U.S.C. § 1391(b) and (c)

15.     because a substantial number of the acts, omissions and transactions that established the claims of the Plaintiffs and the class occurred within this District. Defendants conducted business and solicited business relating to the endless chain scheme and unregistered seller assisted marketing plan from this District. Defendants transacted their affairs, resided within California and this District, and Defendants' wrongful acts occurred in this District.

/ / /

# FACTUAL ALLEGATIONS

**Defendants Create the Illusion of a Legitimate Business Opportunity to Entice Aspiring Female Entrepreneurs Nationwide**

16.    LuLaRoe was founded in 2013 by DeAnne Brady and her husband, Mark Stidham. According to its website www.lularoe.com, DeAnne Brady tells an inspiring tale about how it was conceived after DeAnne Brady was asked to create a "maxi skirt" for her daughter Nicole, who promoted it to her friends via Instagram. Brady purportedly received 44 orders from Nicole's promotion of this "maxi skirt". Thereafter, DeAnne Brady claims to have manufactured another 300 "maxi skirts" manufactured, which Brady promoted via "parties" with her own social acquaintances. DeAnne Brady claims to have sold these initial 300 "maxi skirts" in only three (3) days.

17.    After this success and due to the purported demand for LuLaRoe products, Brady claims that her husband Mark Stidham suggested they come up with a business plan to help "other women make money" by selling LuLaRoe products. Various videos on the Internet depict DeAnne Brady and Mark Stidham telling the same story. Defendants also prominently display a video of DeAnne Brady telling this story on www.lularoe.com. These videos constitute affirmative representations by the Defendants that there is a market for the LuLaRoe product, and there is a market for the LuLaRoe products purchased by LuLaRoe Fashion

Consultants ("Consultants") for resale by to end-user retail customers. According

to its website, LuLaRole's stated mission is as follows:

> "LuLaRoe exists to provide an opportunity for people to create
> freedom by selling comfortable, affordable, stylish clothing, and
> offering its Retailers the independence to set their own pace and
> schedule. This creates the time to spend with those closest to them,
> the very thing DeAnne had once desired for herself!"

18.    The siren call told by DeAnne Brady and Mark Stidham ultimately

attracted more than 80,000 independent consultants nationwide in less four years,

and drove more than $1.3 billion in annual *wholesale* revenues in just over four

years. Upon information and belief, this incredible growth allowed the Defendants'

and their agents **hundreds of millions of dollars** in profits since 2013.

19.    Although Defendants portray this runaway success as an

entrepreneurial success story that helps empower women to start their own

businesses and earn additional income for their households, it is really only an

illusion.

20.    In reality, LuLaRoe is and was nothing more than a calculated endless

chain scheme specifically designed by Defendants to unjustly enrich those at the

top of the pyramid structure of the enterprise at the expense of unsuspecting,

lower-level Consultants. It is no therefore surprise that LuLaRoe's founders had

deep experience within the direct sales and multi-level marketing industries prior to forming LuLaRoe.

21.    By her own admission, DeAnne Brady had over 15 years of experience in various direct sales and network marketing organizations prior to forming LuLaRoe. This experience working under other direct sales and multi-level marketing organizations helped forge ideas for her own multi-level marketing organization – which LuLaRoe was from inception. The calculated design of the LuLaRoe scheme was no accident.

22.    Early on in the process, the Defendants engaged the services of Terrel Transtrum – a renowned strategic consultant with more than 25 years of experience in the direct sales and multi-level marketing industry – to help guide the Defendants in building a successful multi-level marketing organization which would experience the maximize their growth in the shortest amount of time. Upon information and belief, the relationship with Mr. Transtrum ultimately ended as Mark Stidham ultimately sought to grow LuLaRoe as quickly as possible without regard to applicable laws and regulations governing the operation of multi-level marketing organizations and seller assisted marketing plans like LuLaRoe.

23.    Looking at the LuLaRoe enterprise in its totality, it is clear that Defendants' primary goal was not to sell fashionable women's leggings or other

similar products to retail customers, but to profit from the promotion and sale of an unregistered seller assisted marketing plan and endless chain scheme to scores of unsuspecting women who would be forced to purchase thousands of dollars of high-margin products from the Defendants without any regard for whether or not the Consultants would be able to make any sales to retail customers. In other words, it was the LuLaRoe Consultants – not end-user retail purchasers – that were Defendants' real target customer.

24.     Defendants have had remarkable success in selling this unregistered seller assisted marketing plan and endless chain scheme since 2013. Defendants have lavished themselves with millions of dollars in luxuries such as expensive international vacations and exotic supercars. In fact, Mark Stidham is credited as owning the car that recently set the land speed record for a production car – a Koenigsegg Agera RS - which is estimated to cost over $2 million.

/ / /

Koenigsegg Agera RS sets production car land speed record of 277.9 mph

The car is owned by Mark Stidham who actually organized the attempt together with his mates Jeffrey Cheng and John Morris. They had the full blessing of Koenigsegg. As mentioned, a factory driver was behind the wheel. Koenigsegg CEO and founder Christian von Koenigsegg was also present for the epic run.

25.    Both Mark Stidham and DeAnne Brady have enjoyed the "high life", which was built on the backs of hard-working women who sought a legitimate business opportunity that was structured in a way to give them the legal protection they deserve, and operated in a way to ensure that their hard-earned investment in LuLaRoe products would not be squandered in an endless chain scheme. Unfortunately for the vast majority of LuLaRoe Consultants, they have already suffered or are doomed to suffer losses by virtue of their participation in this enterprise.

**LuLaRoe's Enterprise Structure**

26.    LuLaRoe's enterprise structure consists of a nationwide chain of independent distributors referred to as "Independent Fashion Consultants". Consultants could earn money in several ways with LuLaRoe: (i) by selling LuLaRoe products directly to end-user retail customers; (ii) by building a team of "downline" Consultants underneath them who would purchase LuLaRoe products as inventory, for which the "upline" Consultants would earn bonuses or commissions from such "downline" inventory purchases; or (iii) a combination of direct sales and team building. A description of LuLaRoe and the business opportunity is as follows:



simply comfortable

**LuLaRoe Fashion Consultant Business Overview**

The business opportunity for each LuLaRoe Fashion Consultant is quite simple; sell LuLaRoe clothing at Pop-Up Boutiques or Open Houses and make between 35-60% profit on every item you sell based on the suggested retail price. Additionally, if you choose to build a team, you can earn additional income from your team's sales.

**HOW IT WORKS**

LuLaRoe clothing is sold by Fashion Consultants, on the spot, at Pop-Up Boutiques and Open Houses. Think of them as mobile dress-up parties where your friends and neighbors can just come and shop. Based on the number of attendees at a Pop-Up Boutique we see an average sales volume of around 20 items, with an average profit of $15 per item. The more parties you have and the more products you sell, the more money you will earn. As a company, we recommend rewarding the hostess of a boutique with one free item for every 10 items that are sold. This is a guideline, and we encourage you to be generous in your hostess rewards as you seek to build your business through strong partnerships within your individual network.

Wholesale prices range from $8.50 to $31 per item, and suggested retail prices range from $18 to $65. Because products come in a wide array of colors, patterns, prints and fabrics, you will receive an assortment of clothing in the sizes and body styles you choose. Adult sizes run from XXS to 3XL (0-26), and girls' sizes run from 2-14. LuLaRoe pays for all costs to ship your product to you. All orders ship from the warehouse within 3 business days from the time that we receive your payment.

Many Consultants choose to share the LuLaRoe opportunity. Helping others build their own LuLaRoe businesses can increase your personal income. By building your team, you have opportunities to become a leader, earn extra income and to help others succeed.

27.    With regard to direct sales to end-user retail customers, the LuLaRoe business opportunity requires little explanation. Consultants were contractually obligated to purchase product directly from LuLaRoe at wholesale prices, and were authorized by LuLaRoe to resell them at retail prices (typically a 35-60% markup over wholesale pricing) to individual, end-user retail customers. Typically, these sales were made by Consultants through hosted home parties called "pop-up boutiques" that were generally heavily promoted by the Consultant through various social media networks. Consultants were also strongly encouraged to use social media to promote the LuLaRoe products and the LuLaRoe business opportunity itself.

28.    In order to become a LuLaRoe Consultant, individuals would have to find a current LuLaRoe Consultant to sponsor them into the enterprise. The sponsoring Consultant would in turn become the applicant's "upline" Consultant, and the sponsoring Consultant would ultimate receive bonus payments or commissions for inventory purchases made by the "downline" Consultant. Upon information and belief, Defendants sought unlimited recruitment of endless chains of new Consultants, and had no curbs or mechanisms in place to limit the number of new Consultants that would join the LuLaRoe enterprise at the lowest level.

29.     Once a prospective Consultant identified a sponsor, the prospective Consultant would be required to complete and execute an Independent Consultant Program Application and Agreement (the "Application and Agreement"), provide payment information, and submit this to LuLaRoe for processing – which could take upwards of two months for "review". During this time period prospective Consultants were placed in what was referred to as the "Queue", where they waited for LuLaRoe's review and approval. It is unclear what LuLaRoe's review process entailed other than entering prospective Consultants into LuLaRoe's ordering system. After a prospective Consultant received formal approval, the Consultant is sent an onboarding invitation, and their account is activated for placing their initial order.

30.     A Consultants initial order of LuLaRoe inventory generally ranged from approximately $5,000 to $9,000. In most instances, the funds for this initial purchase were placed on credit cards, or taken from savings or retirement accounts. However, many Consultants were told by "upline" Consultants to take out multiple credit cards to purchase the initial inventory, and to conceal the large initial inventory purchases from their husbands. And in at least one instance, according to an infamous online video posted by a high level "upline" LuLaRoe Consultant,

some women even allegedly sold their breast milk to hospitals generate the funds necessary to make their initial LuLaRoe inventory purchase.

31.    In addition to the large initial inventory purchase, Consultants would also need to incur out-of-pocket expenses of upwards of $1,000 to purchase basic startup materials, such as racks, hangers, bags, marketing materials, storage units, and other supplies and materials necessary to start selling LuLaRoe products.

32.    When ordering inventory from LuLaRoe, Consultants were able to choose the styles and sizes of the items they wanted to purchase, but generally could not choose the colors or patterns of items they would receive. As a result, Consultants often receive patterns that are unpopular (and therefore unsaleable), and would have to repeatedly place inventory orders with frequency to ensure that they had an inventory of saleable merchandise that was in demand. As described in more detail below, this was another calculated mechanism designed by the Defendants to encourage Consultants to purchase as much inventory as possible without regard for whether or not the Consultants would be able to sell the items in their inventory to end-user retail customers.

33.    Consultants were provided with some security on their investment in LuLaRoe inventory by virtue of LuLaRoe's buy-back program. In essence, Consultants who sought to cancel their agreement with LuLaRoe would be able to

return their unsold inventory in exchange for a refund ranging from 90%-100%. This buy-back program created the perception that the LuLaRoe business opportunity was a low-risk venture on the part of the Consultants, in that they could return most if not all of their unsold inventory in the event the business opportunity was unsuccessful. As described below, however, this buy-back program was only yet another illusion created by the Defendants.

34.    Once the initial order was shipped to the Consultant, they would then be instructed follow a marketing plan created and promoted by the Defendants. While the LuLaRoe marketing plan was generally referred to as the "72 Hour Plan", it generally consisted of (1) making a list of 50 or more personal contacts; (2) telling the Consultant's personal contacts about LuLaRoe and the Consultant's new "business" selling LuLaRoe products; (3) booking at least three (3) "pop-up boutiques" (with the first being held within 10 days of receiving the initial order); and (4) by aggressively promoting their "pop-up" boutique and marketing LuLaRoe products both online (mostly via social media) and offline (print flyers, telephone solicitations, etc.). Defendants encouraged Consultants to repeat this process as often as necessary to promote their "business" and LuLaRoe products.

35.    Consultants always had the support of their "upline" Consultants, a well as what the Defendants called the "Home Office". Defendants represented to

the Consultants that they were vested in the Consultants' success, and provided

tools, sales materials and training to them. A sample representation of this training

and support that came as part of the LuLaRoe is as follows:

### HOME OFFICE SUPPORT

LuLaRoe continues to be vested in your success by providing tools, sales materials, and
training to help you succeed, with the goal of making this a profitable and enjoyable
business opportunity for you.

We look forward to serving you  and we trust that you will love the incredible opportunity
that awaits at LuLaRoe!

36.     In order to remain active with LuLaRoe, Consultants were required to

make monthly minimum *sales* of 33 units. LuLaRoe's specific policy is as follows:

> "An Independent Fashion Consultant will be considered Inactive in
> any month that they do not produce minimum sales of 33 units.
> Independent Fashion Consultants that do not produce sales totaling at
> least 99 units in a period of three (3) consecutive months will be
> considered Inactive for that three month period. Inactivity for two
> consecutive three month periods will result in the cancellation of the
> Independent Fashion Consultant's Independent Fashion Consultant
> Agreement."

37.     As a result, the Defendants adopted a pattern and practice of

interpreting and enforcing this policy as one requiring monthly minimum

*purchases* by Consultants to stay active. In other words, Consultants were required

by the Defendants to continually *purchase* at least 33 units of LuLaRoe product per

month to avoid cancellation of their contract for inactivity. In addition to the 33-

unit monthly minimum, any "upline" Consultants with a "downline" team had

additional team monthly purchase minimums that were required to maintain their position in the enterprise, and the bonuses and commission that they received for "downline" purchases. Beyond monthly minimum requirements, in most cases LuLaRoe also required Consultants to place minimum orders of 33 units (e.g. if they only needed 5 units, they would be forced to order 33 units).

38.     This pattern and practice of imposing minimum purchase requirements on the Consultants was without regard for whether the Consultants were ultimately selling their purchased inventory to end-user retail customers. Defendants were simply creating a system that forced Consultants to load up on inventory without any compliance mechanism to ensure that Consultants were also making actual retail sales of the inventory to individual end-user retail customers. This pattern and practice of encouraging "inventory loading" by Consultants was what the Defendants intended, and was constantly reinforced by the Defendants constant communication of the phrase "Buy More, Sell More", or words of similar import, to the Consultants. Inventory loading is also the hallmark of an illegal endless chain scheme.

39.     Because LuLaRoe constantly changed their patterns, Defendants and their agents had rational explanations to purportedly justify this inventory loading. This included stressing the importance of having "fresh inventory" to sell to

customers, or the importance of having limited run pieces (referred to as "unicorns") in their inventory. Unbeknownst to the Consultants, however, "Buy More, Sell More" was really a policy and practice that Defendants institutionalized in the LuLaRoe culture to encourage inventory loading by inducing Consultants to purchase as much inventory as they possibly could each month. "Buy More, Sell More" ultimately became the marching order that the Defendants expected the Consultants to run their "businesses" by. Ultimately, the more LuLaRoe products that the Consultants purchased, the more profitable the enterprise was for the Defendants.

40.    Defendants' calculated design of the LuLaRoe enterprise also aligned the interests of "upline" Consultants to pressure "downline" Consultants to inventory load through the structure of the LuLaRoe Leadership Bonus Plan (the "Bonus Plan"). Although Consultants could (theoretically) money selling to end-user retail customers, the easier and better way for Consultants to grow their "business" and maximize their earning potential was to build a team of "downline" Consultants for which they would receive bonus and commission payments under Bonus Plan. Building a team of "downline" Consultants and hitting the various bonus and sales volume milestones was the only way a Consultant could advance within the LuLaRoe enterprise.

41.    The Bonus Plan consisted of bonus payments to "upline" Consultants for inventory ordered and purchased by "downline" Consultants. There are different levels of bonus compensation payments depending on how many "downline" Consultants were on a particular "upline" Consultant's "team". LuLaRoe compensated "upline" Consultants on a sliding scale depending on their level, which ranged from 3-5%, and participation in LuLaRoe's leadership bonus pool program once a Consultant reached a certain level within the enterprise. Examples of the Bonus Plans are readily available on the Internet. Some of the applicable Bonus Plans are attached as Exhibits A and B.

42.    The Bonus Plans make it clear that the "upline" Consultant compensation is not in any way tied to retail sales, but rather it is tied to the value of the inventory orders placed by "downline" Consultants. "Upline" Consultants were therefore incentivized to encourage "downline" Consultants to purchase as much inventory as possible without any regard to whether they were making, or were likely to make, any bona fide sales to end-user retail customers. ***In other words, the Bonus Plans compensated those at the top of the pyramid for recruiting others into the scheme.*** This allowed Defendants to offload massive amounts of high margin LuLaRoe products onto unsuspecting "downline"

Consultants that would have difficulty even breaking even on initial their inventory purchase, let alone subsequent monthly minimum inventory purchases.

43.    By aggressively pushing recruitment of new Consultants over retail sales, Defendants completely oversaturated the marketplace LuLaRoe Consultants and damaged market for bona fide retail customers. In many instances, Consultants at or near the bottom of the enterprise have been forced to sell at discounts to even be competitive. Social media networks are filled with LuLaRoe Consultants shamelessly promoting products that can be purchased just about anywhere by any of the more than 80,000 LuLaRoe Consultants out there.

44.    In fact, despite LuLaRoe's general prohibition of online sales through traditional retail websites like eBay, a cursory review of eBay reveals more than 210,000 results for LuLaRoe products – which appear to include both new and preowned LuLaRoe products. In other words, LuLaRoe's aggressive recruitment of new Consultants over promotion of bona fide retail sales by existing Consultants has oversaturated the marketplace with LuLaRoe Consultants, and LuLaRoe products.

**LuLaRoe is Nothing More than an Illegal, Endless Chain Scheme**

45.    LuLaRoe's enterprise and compensation structure make it clear that it is nothing more than an endless chain scheme, or pyramid scheme. Defendants

claim, however, that it is a legitimate direct sales or multi-level marketing opportunity. The distinction between a legal and legitimate multi-level marketing enterprise and an illegal endless chain scheme is often subtle, would have been difficult to detect for new Consultants joining the enterprise.

46.    In legitimate direct sales organizations, individuals by wholesale products from the manufacturer and resell them at retail prices directly to the public – often by word of mouth and other in-person direct sales. Typically, distributors earn commissions, not only for their own retail sales, but also for retail sales made by the people they recruit.

47.    According to the Federal Trade Commission's website, if the money made by the distributors is based on retail sales to the public, it may be a legitimate direct sales organization. However, if the money made by distributors is based on the number of people a distributor recruits and wholesale inventory sales to them, it may not be legal and it could be an endless chain scheme (also known as a pyramid scheme). Endless chain schemes are illegal, and the vast majority of participants in them lose money.

48.    Pyramid schemes come in many forms that they may be difficult to recognize by prospective participants. However, pyramid schemes all share one overriding characteristic – the fact that profits based primarily on recruiting others

to join the program, and not based on profits from any real sales of goods to the public. Some pyramid schemes purport to sell a product, but in many instances they often simply use the product to hide the pyramid structure. According to the FTC, there are two tell-tale signs that a product is simply being used to disguise a pyramid scheme: (i) inventory loading; and (ii) a lack of retail sales.

49.    As described above, inventory loading occurs when a company's incentive program forces recruits to buy more products than they could ever sell, often at inflated prices. If this occurs throughout the company's distribution system, the people at the top of the pyramid reap substantial profits, even though little or no product moves to market. The people at the bottom make excessive payments for inventory that simply accumulates in their basements. A lack of retail sales is also a red flag that a pyramid exists. Many pyramid schemes will claim that their product is selling like hot cakes. However, on closer examination, the sales occur only between people inside the pyramid structure or to new recruits joining the structure, not to consumers out in the general public.

50.    The vast majority of people in pyramid schemes lose money. According to at least one expert on multi-level marketing plans, 99.6% of all participants in a product-based multi-level marketing plan will lose money. According to this math, those that participate in a product-based multi-level

marketing program like LuLaRoe have a better chance in making money by placing a single bet on one number at roulette wheel at a casino (2.9% chance of profit) then they do in participating in a product-based multi-level marketing program (.4% chance of profit). *See,* Exhibit C. **Simply put, Consultants had a better odds gambling than they did by getting involved with LuLaRoe.**

51.     Endless chain schemes and pyramid schemes are illegal at both the state and federal level. In *Webster v. Omnitrition Int'l, Inc.*, the Ninth Circuit adopted the "*Koscot* test" for determining what constitutes a pyramid scheme:

> "Pyramid schemes are '[s]uch contrivances. . . characterized by the payment by participants of money to the company in return for which they receive (1) the right to sell a product and (2) the right to receive in return for recruiting other participants into the program rewards which are unrelated to sale of the product to ultimate users.'"

52.     *Webster v. Omnitrition Int'l. Inc.*, 79 F.3d 776, 781 (9th Cir. 1996) ("*Omnitrition*") quoting *In re Koscot Interplanetary, Inc.*, 86 F.T.C. 1106, 1181 (1975), aff'd mem. sub nom. ("*Koscot*").

53.     The second element of the *Koscot* test often considered the determining element for what distinguishes a pyramid scheme from a legitimate direct sales organization. The satisfaction of the second element of the Koscot test is the *sine qua non* of a pyramid scheme:

> "As is apparent, the presence of this second element, recruitment with rewards unrelated to product sales, is nothing more than an elaborate

CLASS ACTION COMPLAINT AND DEMAND FOR TRIAL BY JURY
- 25 -

chain letter device in which individuals who pay a valuable consideration with the expectation of recouping it to some degree via recruitment are bound to be disappointed."

54.    *Omnitrition*, 79 F.3d at 782. The Ninth Circuit held that "the operation of a pyramid scheme constitutes fraud for purposes of several federal antifraud statutes." *Id*.

55.    A multi-level marketing organization where members obtain monetary benefits primarily from the recruitment of new members rather than from selling goods to bona fide consumers is an endless chain scheme. Even if some retail sales occur, endless chain schemes are inherently deceptive because most participants are doomed to fail:

> "'The promise of lucrative rewards for recruiting others tends to induce participants to focus on the recruitment side of the business at the expense of their retail marketing efforts, making it unlikely that meaningful opportunities for retail sales will occur.' Thus, the fact that some retail sales occur does not mitigate the unlawful nature of the overall arrangement."

56.    *Omnitrition*, 79 F.3d at 782, citing *In re Ger-Ro-Mar Inc.*, 84 F.T.C. 95, 148-49 (1974), rev'd on other grounds, 518 F.2d 33 (2d Cir. 1975). In this case, LuLaRoe cannot save itself simply by pointing to the fact that at least some Consultants make *some* retail sales. *Id* at 148-49.

57.    "Like chain letters, pyramid schemes may make money for those at the top of the chain or pyramid, but 'must end up disappointing those at the bottom

who can find no recruits.'" *Omnitrition*, 79 F.3d at 781 (quoting *Koscot*, 86 F.T.C. 1106, 1181 (1975), aff'd mem. sub nom., *Turner v. F.T.C.*, 580 F.2d 701 (D.C. Cir. 1978)).

58.    Endless chain schemes are inherently fraudulent by nature because the futility of the plan is not apparent to the participant:

> "Misrepresentations, knowledge and intent follow from the inherently fraudulent nature of a pyramid scheme as a matter of law. As to justifiable reliance, the very reasons for the per se illegality of Endless Chain schemes is their inherent deceptiveness and the fact that the 'futility' of the plan is not 'apparent to the consumer participant.'" *Omnitrition*, 79 .3d at 788 (citations omitted).

59.    Section 327 of the California Penal Code prohibits endless chains:

> "Every person who contrives, prepares, sets up, proposes, or operates any endless chain is guilty of a public offense, and is punishable by imprisonment in the county jail not exceeding one year or in state prison for 16 months, two, or three years. the disposal or distribution of property whereby a participant pays a valuable consideration for the chance to receive compensation for introducing one or more additional persons into participation in the scheme or for the chance to receive compensation when a person introduced by the participant introduces a new participant."

> Compensation as used in this section, does not mean or include payment based upon sales made to persons who are not participants in the scheme and who are not purchasing in order to participate in the scheme.

60.    Section 1689.2 of the California Civil Code provides:

> "A participant in an endless chain scheme, as defined in Section 327 of the Penal Code, may rescind the contract upon which the scheme is

based, and may recover all consideration paid pursuant to the scheme,
less any amounts paid or consideration provided to the participant
pursuant to the scheme."

61.    In this case, Defendants cannot save themselves from LuLaRoe's

classification as an illegal endless chain scheme by pointing to policies and

procedures that discourage inventory loading and help distinguish a legitimate

direct sales organization from an illegal endless chain scheme.

62.    In the seminal case *In re Amway Corp.*, 93 F.T.C. 618 (1979), the

FTC recognized three rules that served as a guide for direct marketing or multi-

level marketing organizations avoid the characteristics of a pyramid scheme:

> (1) Upline distributors were required to buy back from any person
> they recruited any saleable, unsold inventory upon the recruit's
> leaving Amway (the "Buy-Back Rule");
> (2) Every participant was required to sell at wholesale or retail at least
> 70% of the products bought in a given month in order to receive a
> bonus for that month (the "70% Rule"); and
>
> (3) In order to receive a bonus in a month, each participant was
> required to submit proof of retail sales made to ten different
> consumers (the "10 Customer Rule").

63.    Under the FTC Act, these rules are designed to deter inventory

loading and encourage retail sales. In *Omnitrition*, the Ninth Circuit

explained that where a distribution program appears to meet the *Koscot*

definition of a pyramid scheme but has elements of the *Amway* safeguards,

"there must be evidence that the program's safeguards are enforced and

actually serve to deter inventory loading and encourage retail sales."

*Omnitrition*, 79 F.3d 776 (1996). Here, Defendants cannot find refuge under

the *Amway* test as the LuLaRoe enterprise did not have adequate safeguards

to deter inventory loading and encourage retail sales.

64.    LuLaRoe did offer a buy-back (refund) program, but it was

insufficient to reduce or eliminate the possibility of inventory loading by

Consultants. Despite a temporary waiver of its official buy-back policy between

March and September of 2017, LuLaRoe's buy-back policy typically offered a

refund 90% of the net cost of a product's original purchase price. Consultants

seeking a refund would also have to bear their own return shipping costs (which

can be substantial).

65.    However, the LuLaRoe buy-back policy also places significant

additional restrictions on product refunds, including certain stipulations such as it

would only repurchase items purchased by Consultants within one year prior to the

date of cancellation of their agreement, and it only refund products in "resalable

condition" – which appears to be determined in LuLaRoe's sole discretion. As a

result, LuLaRoe's buy-back program would potentially would not reduce or

eliminate the possibility of Consultants being saddled with thousands of dollars of

products with unsaleable patterns – especially for those Consultants that purchased and accumulated inventory over a multi-year period.

66.    But where Defendants' willfully disregard the protections set forth in *Amway* to ensure that the LuLaRoe enterprise is not an endless chain scheme is in its failure to adopt, implement, or enforce a 70% Rule and 10 Customer Rule. As a billion-dollar enterprise, Defendants were charged with the obligation to comply with regulations that may apply to the LuLaRoe enterprise. It most certainly has the resources to hire some of the top experts in the direct sales industry (like Terrel Transtrum), and some of the top law firms in the United States (such as Rutan & Tucker). So it is impossible to believe that Defendants were ignorant to the risks inherent in a direct selling model, and impossible to believe that they did not willfully, intentionally or recklessly fail to implement the necessary safeguards to run a legal, legitimate direct sales organization.

67.    In addition to their lack of *Amway* protections, Defendants' policy of encouraging inventory loading by lower level "downline" Consultants without regard to retail sales also is prima facie evidence of an endless chain scheme. Consultants were the real target customers for Defendants product, not end-user retail customers. By pressuring Consultants to not only purchase more inventory notwithstanding retail sales, and to pressure Consultants to reinvest any profits

they may have generated from their "business" back into LuLaRoe inventory, Defendants were essentially converting otherwise meaningful profits that otherwise belonged to the Consultants. Defendants ultimately operated an endless chain scheme, which has directly and proximately damaged tens of thousands of Consultants nationwide.

**Defendants Willfully Violate California's Seller Assisted Marketing Plan Act**

68.    Not only did Defendants operate the LuLaRoe enterprise as an illegal endless chain scheme, but they have engaged in the promotion and sale of an unregistered seller assisted marketing plan. Under the California Seller Assisted Marketing Plan Act, ("California SAMP Act"), California requires that seller assisted marketing plans that operate from within California that offer business opportunities to the general public to (1) register with the California Attorney General's Office; (2) to provide significant disclosure statements to potential buyers of the marketing plan being sold prior to signing any contracts; and (3) to provide the buyers of the marketing plan specific contractual rights after a purchase has been made. *See*, Cal. Civ. Code § 1812.200 *et seq*.

69.    In this case, despite the fact that the Defendants were domiciled in California, maintained their principal place of business in California, and offered and sold the LuLaRoe business opportunity from California, Defendants chose to

willfully violate the California SAMP Act by (1) failing to register with the California Attorney General's Office; (2) failing to provide the significant disclosures to prospective Consultants as required by the California SAMP Act; and (3) by failing to provide the Consultants with the buyer-specific contractual rights required by the California SAMP Act.

70.     As stated above, as a billion-dollar business that hired industry experts to help guide them in the structure of their direct sales organization, Defendants cannot claim ignorance of the law. In fact, Defendants have recently taken steps to try to disclaim its legal and regulatory obligations in in its Application and Agreement by specifically addressing business opportunities and seller assisted marketing plans. A recent version of the Application and Agreement reads as follows:

> 8.     Consultant shall establish Consultant's own goals, inventory levels, working hours and methods of sale, so long as Consultant complies with the terms of this Agreement, including the Policies and Procedures and Leadership Bonus Plan, and all applicable laws. LLR does not maintain or enforce exclusive sales areas or territories for the benefit of Consultant. Consultant expressly acknowledges that neither this Agreement, nor any compensation, bonuses, commissions or incentive plans or programs pertaining to the Product, business, consultants, Policies and Procedures, Leadership Bonus Plan or Price List of LLR constitutes a franchise, business opportunity, or seller assisted marketing plan or other regulated sales relationship. Specifically, LLR does not represent that Consultant can earn any amount hereunder, whether or not in excess of any initial purchase of Product made by Consultant, or that there is a market for the Product.

71.     By drafting language into the Application and Agreement attempting to disclaim its legal obligations is proof that Defendants indeed identified possible need to register under the California SAMP Act and comply with its obligations

thereunder, but willfully and intentionally chose not to do so. As set forth below, this purported disclaimer regarding seller assisted marketing plans is a false statement of material fact, as LuLaRoe's business opportunity is the exact type of seller assisted marketing plan that the California Legislature sought regulate and protect the public from.

72.     From California, over the past four years, Defendants have sold the LuLaRoe marketing plan to over 80,000 Consultants nationwide. Each marketing plan was purchased by a Consultant in connection with starting their own LuLaRoe "business". The total initial payment Consultants paid for their initial product order exceeds $500, but is less than $50,000. Defendants, individually and through its agents, (1) represented that the Consultants were likely to earn an amount in excess of the initial payment; (2) represented that there is a market for LuLaRoe products that were purchased by the Consultants; and (3) represented that LuLaRoe would, in whole or in part, buy back or is likely to buy back the LuLaRoe product initially sold to the Consultants. Defendants also represented or implied that they have sold the LuLaRoe seller assisted marketing plan to at least five (5) other Consultants in the previous 24 months, and intend to sell the LuLaRoe seller assisted marketing plan to at least five (5) Consultants in the next 12 months. Defendants each resided in California when it made it offered and sold the LuLaRoe seller assisted

marketing plan to prospective Consultants. Therefore, Defendants cannot deny

they were required to comply with the California SAMP Act, and that they

willfully violated it.

**Defendants Fail to Provide Prospective Consultants with Any
Meaningful Information about the LuLaRoe Business Opportunity or
the Defendants**

73.     Defendants also never provided any Consultant with (i) a detailed

explanation of the business opportunity; (ii) the current state of the retail market

for LuLaRoe products; (iii) the general market conditions for women's fashion and

clothing products; (iv) the current market for additional LuLaRoe Consultants; (v)

any information regarding retail sales statistics for LuLaRoe Consultants; (vi) any

information regarding the financials of LuLaRoe; (vii) any information of the

owners of and investors in LuLaRoe; (viii) any information on the profitability of

LuLaRoe; or (ix) any of the investors in or owners of LuLaRoe or its related

entities. This information was material to help make prospective LuLaRoe

Consultants make an informed decision on whether or not to purchase or otherwise

invest in a LuLaRoe seller assisted marketing plan.

74.     Consultants were ultimately left in a vulnerable position by virtue of

the seller assisted marketing plan that they purchased from LuLaRoe. The

marketing plan promoted and sold by the Defendants and their agents required

monthly minimum purchases to stay active with LuLaRoe. The marketing plan promoted and sold by the Defendants and their agents also strongly encouraged (or pressured) the Consultants into reinvesting their profits into more inventory, and purchasing more inventory to keep it "fresh" – as LuLaRoe's patterns were constantly changing and Consultants were not allowed to choose the patterns they wanted. This was by designed, and served as a device to deceive the Consultants and to further the endless chain nature of this scheme.

75.    The lack of any controls or rigor around saturating the market with LuLaRoe products or Consultants was by design. Defendants intentionally made no effort to control supply of their product, intentionally made opportunity of becoming a LuLaRoe Consultant a commodity. This is because Defendants true intent was to sell a seller assisted marketing plan to Consultants, who would in turn purchase high volumes of high-margin profits from the Defendants – thereby enriching them in the process. Defendants did not care if the Consultants made any retail sales, as they had little profit motive in driving retail sales like a traditional women's clothing business does. Instead, Defendants were in the business of promoting and selling unregistered seller assisted marketing plans to unsuspecting Consultants nationwide.

76.     Defendants also made no genuine effort to retain and nurture existing Consultants, and made little effort to help drive retail sales of their products. This is because it was much more lucrative for the Defendants to create a system to "churn" through new Consultants who would purchase thousands of dollars in initial inventory, along with early inventory loading sales before they would fail in the LuLaRoe scheme. By focusing their efforts and resources on recruitment rather than driving bona fide retail sales, Defendants were looking out for their own best interest to the detriment of the Consultants. Simply put, it was much more lucrative for Defendants to sell inventory to Consultants who were conditioned to purchase inventory than it was to toil trying to sell LuLaRoe product to end-user retail customers. As a direct and proximate result of this misconduct, the Plaintiffs and the Class has suffered actual damages as alleged herein.

## PLAINTIFFS' INDIVIDUAL ALLEGATIONS

**Plaintiff Laura Rocke**

77.     Laura Rocke executed an Independent Consultant Program Application and Agreement with the Defendants on or about on July 2, 2016, and was approved as a Consultant sometime shortly thereafter. After she was approved, Rocke placed an initial order with LuLaRoe of approximately $5,750, and invested approximately $1,000 in supplies for her "business". Between the initial order and

the supplies that she purchased, Rocke invested virtually her entire savings at that time into LuLaRoe's business opportunity.

78.    Defendants and their agents led her to believe that it would take approximately three to six months to breakeven on her investment in her LuLaRoe "business". Once she was formally approved as a Consultant, Defendants and other higher-level Consultants inundated her with the phrase "Buy More, Sell More", or words of similar import. She was also unaware of the critical importance of being active on social media prior to becoming a Consultant, as she had just recently joined Facebook around the time she become a Consultant. Despite over a year of hard work and persistence, Rocke was unable to sell all the inventory that she purchased from LuLaRoe, and ultimately suffered a loss on her LuLaRoe "business". Rocke is still stuck with unsaleable inventory, and has suffered actual monetary losses as a direct and proximate result of becoming a Consultant with LuLaRoe. Despite the fact that Rocke suffered actual monetary losses, Defendants and Rocke's "upline" Consultants ultimately profited from Rocke's purchase of inventory from LuLaRoe.

79.    Immediately prior to Rocke executing the Application and Agreement, in July 2, 2016 in Reno, Nevada, when Defendants and their agents were selling the LuLaRoe business opportunity to Rocke, they had affirmative duty

to fully explain the LuLaRoe business opportunity (including the risks and potential rewards) to Rocke prior to her executing the Application and Agreement. On July 2, 2016, Defendants and their agents, falsely represented and implied that LuLaRoe was a legitimate business opportunity making false and misleading statements to Rocke such as "LLR is a direct sales company that markets its products through Independent Fashion Consultants" when in reality its enterprise structure met the definition of an illegal endless chain scheme. On July 2, 2016, Rocke relied on the misrepresentation that LuLaRoe was a legitimate business opportunity when she elected to execute her Application and Agreement to become a LuLaRoe Consultant. On July 2, 2016, Defendants and their agents, omitted the following material facts in connection with their offer to sell the LuLaRoe seller assisted marketing plan to Rocke, including but not limited to the following:

> (1) that because "upline" bonus revenue was not calculated on retail sales, there was a pattern and practice within the LuLaRoe organization of encouraging "downline" Consultants to continue to purchase LuLaRoe inventory regardless of if they were making any retail sales (i.e. inventory loading);

(2) that incentivizing inventory loading was a mechanism for Defendants and "upline" Consultants to earn profits at the expense of "downline" Consultants;

(3) that Defendants had not implemented or enforced a 70% Rule or 10 Customer Rule to prevent inventory loading by Consultants, or otherwise protect "downline" Consultants from inventory loading;

(4) that the minimum monthly *sale* requirement of 33 units was enforced in practice as a minimum monthly *purchase* requirement of 33 units;

(5) that LuLaRoe when emphasized "leadership" as a virtue, Defendants true intent was to encourage existing Consultants to recruit new Consultants to build their "teams" so that Defendants could sell more wholesale inventory to new Consultants;

(6) that it was generally more lucrative for Consultants to focus on recruiting other Consultants and to receive monthly bonus payments under then Bonus Plan than it was focusing on making bona fide retail sales to end-user customers;

(7) that by aggressively recruiting new Consultants, that Defendants were oversaturating the market with LuLaRoe Consultants across the United States;

(8) that by oversaturating the market with LuLaRoe Consultants, end-user interest in purchasing LuLaRoe products may decrease;

(9) that wholesale sales by the Defendants to the Consultants greatly exceeded bona fide retail sales by Consultants to end-user retail customers;

(10)  that Defendants were operating LuLaRoe as an illegal endless chain scheme created and operated by the Defendants to enrich themselves at the expense of the Consultants; and

(11)  that Defendants had willfully failed to register the LuLaRoe seller assisted marketing plan with the California Attorney General's office.

80.    At all relevant times, Defendants and their agents were under a continuing duty to disclose all material facts regarding the LuLaRoe business opportunity while Rocke was a Consultant with LuLaRoe. The aforementioned omissions were material to Rocke, as she was unable to fully evaluate the LuLaRoe business opportunity, LuLaRoe's business structure, and the attendant risks of becoming and staying a LuLaRoe Consultant, until after purchased a substantial inventory from the Defendants, and until after she had made a significant investment into her LuLaRoe "business".

81.    Rocke relied on the misrepresentations of the Defendants and their agents in connection with her purchase of the LuLaRoe seller assisted marketing plan, and would not have become a LuLaRoe Consultant had the omitted material risks described above were fully disclosed to her. Further, Rocke would not have become a LuLaRoe Consultant when had she known that (i) there was a pattern and practice of encouraging inventory loading by "downline" Consultants by the Defendants and "upline" Consultants; (ii) that there were no protections in place for "downline" Consultants to prevent inventory loading or protect them from "inventory loading"; and (iii) that LuLaRoe was an endless chain scheme created and operated by the Defendants to enrich themselves and those at the top of the LuLaRoe organization.

82.    Defendants material omissions, and Rocke's ignorance of these material omissions, continued through at least October 2017. Defendants benefited from these material omissions they concealed the true nature of the LuLaRoe business opportunity, which served as an aid to induce Rocke into believing that this was a legitimate business opportunity. As a result of these material omissions, Rocke had no reason to believe that the LuLaRoe business opportunity was illegitimate, or an illegal endless chain scheme. Rocke ultimately purchased

thousands of dollars of inventory from the Defendants which reaped the Defendants substantial profits.

83.    Rocke was also led to believe by Defendants and their agents that LuLaRoe was a seller assisted marketing plan, in that (i) Defendants advertised and otherwise represented to Rocke that for the purchase of more than $500 in LuLaRoe inventory that would be used by Rocke to start, maintain and operate her LuLaRoe "business" (ii) that Rocke could earn an amount in excess of her initial inventory purchase; (iii) that there was a market for LuLaRoe products purchased by Rocke from the Defendants; and (iv) that Defendants would buy back, or would likely buy back, in whole or in part, Rocke's initial LuLaRoe inventory purchase upon cancellation of Rocke's agreement with Defendants.

84.    Rocke was also led to believe by the Defendants and their agents that this seller assisted marketing plan included a marketing plan, along training and support for her in connection with her LuLaRoe "business". Rocke was led to believe that this marketing plan would include, but not be limited to, an initial sales and marketing plan, business assets (i.e. marketing materials), training calls, support from her sponsor and other "upline" Consultants, and opportunities to attend LuLaRoe sales conferences. Rocke reasonably believed that the marketing

plan provided by the Defendants and their agents would help her succeed in her LuLaRoe "business".

85.    Despite being a seller assisted marketing plan, Rocke was never informed that Defendants had failed to register its seller assisted marketing plan with the California Attorney General's Office. Rocke was never provided with any disclosures or any disclosure document as required by California Civil Code § 1812.200 *et seq.* Rocke's agreement with Defendants did contain the contractual terms required by California Civil Code § 1812.200 *et seq.*

86.    Between July 2, 2016 and July 2017, consistent with their "Buy More, Sell More" policy, Defendants and their agents constantly pressured Rocke to purchase more inventory notwithstanding the prospect of bona fide retail sales. Rocke reasonably believed that this inventory loading was consistent with the marketing plan that Defendants sold her, and was in her best interest. In other words, by reinvesting her profits in more inventory and continuing to purchase additional inventory, she reasonably believed that this would help drive retail sales. Rocke was ignorant to the fact that this inventory loading policy was actually a device to get lower level "downline" Consultants to purchase inventory so that Defendants and "upline" Consultants could profit at her expense. Ultimately Rocke

made a substantial investment – and reinvested her profits – into additional

inventory which she was not able to sell.

87.    After a substantial investment of time, money, and effort into selling

LuLaRoe products, Rocke ultimately concluded that it was too difficult to make

money selling LuLaRoe products to end-user retail customers. This conclusion was

based in part on the fact that there was a general oversaturation of LuLaRoe

Consultants, and that there was an oversaturation of LuLaRoe products that were

already sold to end-user retail customers. In other words, contrary to what she was

led to believe, Rocke ultimately concluded that there was little or no natural market

for LuLaRoe products. As a direct and proximate result of her reliance on the

misrepresentations and omissions made by Defendants between July 2, 2016

through October 2017 as described above, Rocke has suffered actual damages that

includes unsaleable inventory that Defendants refuse to provide her a full refund

for, out-of-pocket startup and operational expenses which she will not be able to

recoup, and lost time and opportunity costs.

**Plaintiff Stephenie McGurn**

88.    Plaintiff Stephenie McGurn executed an Independent Consultant

Program Application and Agreement with the Defendants on or about on June 29,

2015, and was approved as a Consultant sometime shortly thereafter. After she was

approved, McGurn placed an initial order with LuLaRoe of approximately $5,300, and invested approximately $1,000 in supplies for her "business". To finance the initial order and startup supplies, McGurn used two different credit cards.

89.     Defendants and their agents led her to believe that it would take approximately one to two months to breakeven on her investment in her LuLaRoe "business". Once she was formally approved as a Consultant, Defendants and her "upline" Consultants inundated her with the phrase "Buy More, Sell More", or words of similar import. Despite approximately a year of hard work and persistence, McGurn was unable to sell all the inventory that she purchased from LuLaRoe, and ultimately suffered a loss on her LuLaRoe "business". McGurn was ultimately stuck with unsaleable inventory which she had to give away to family and friends, and has suffered actual monetary losses as a direct and proximate result of becoming a Consultant with LuLaRoe. McGurn is now carrying a $10,000 credit card balance which is attributable to her LuLaRoe "business", and has suffered significant damage to her credit as a result of being unable to pay down this balance. Despite the fact that McGurn suffered actual monetary losses, Defendants and McGurn's "upline" Consultants ultimately profited from McGurn's purchase of inventory from LuLaRoe.

90.    Immediately prior to McGurn executing the Application and Agreement, in June 29, 2015, in Morton, Pennsylvania, when Defendants and their agents were selling the LuLaRoe business opportunity to McGurn, they had affirmative duty to fully explain the LuLaRoe business opportunity (including the risks and potential rewards) to McGurn prior to her executing the Application and Agreement. On June 29, 2015, Defendants and their agents, falsely represented and implied that LuLaRoe was a legitimate business opportunity making false and misleading statements to Rocke such as "LLR is a direct sales company that markets its products through Independent Fashion Consultants" when in reality its enterprise structure met the definition of an illegal endless chain scheme. On June 29, 2015, McGurn relied on the misrepresentation that LuLaRoe was a legitimate business opportunity when she elected to execute her Application and Agreement to become a LuLaRoe Consultant. On June 29, 2015, Defendants and their agents omitted the following material facts in connection with their offer to sell the LuLaRoe seller assisted marketing plan to McGurn, including but not limited to the following:

(1) that because "upline" bonus revenue was not calculated on retail sales, there was a pattern and practice within the LuLaRoe organization of encouraging "downline" Consultants to continue to purchase LuLaRoe

inventory regardless of if they were making any retail sales (i.e. inventory loading);

(2) that incentivizing inventory loading was a mechanism for Defendants and "upline" Consultants to earn profits at the expense of "downline" Consultants;

(3) that Defendants had not implemented or enforced a 70% Rule or 10 Customer Rule to prevent inventory loading by Consultants, or otherwise protect "downline" Consultants from inventory loading;

(4) that the minimum monthly *sale* requirement of 33 units was enforced in practice as a minimum monthly *purchase* requirement of 33 units;

(5) that LuLaRoe when emphasized "leadership" as a virtue, Defendants true intent was to encourage existing Consultants to recruit new Consultants to build their "teams" so that Defendants could sell more wholesale inventory to new Consultants;

(6) that it was generally more lucrative for Consultants to focus on recruiting other Consultants and to receive monthly bonus payments under then Bonus Plan than it was focusing on making bona fide retail sales to end-user customers;

(7) that by aggressively recruiting new Consultants, that Defendants were oversaturating the market with LuLaRoe Consultants across the United States;

(8) that by oversaturating the market with LuLaRoe Consultants, end-user interest in purchasing LuLaRoe products may decrease;

(9) that wholesale sales by the Defendants to the Consultants greatly exceeded bona fide retail sales by Consultants to end-user retail customers;

(10)  that Defendants were operating LuLaRoe as an illegal endless chain scheme created and operated by the Defendants to enrich themselves at the expense of the Consultants; and

(11)  that Defendants had willfully failed to register the LuLaRoe seller assisted marketing plan with the California Attorney General's office.

91.    Defendants and their agents are and were under a continuing duty to disclose all material facts regarding the LuLaRoe business opportunity while McGurn was a Consultant with LuLaRoe. The aforementioned omissions were material to McGurn, as she was unable to fully evaluate the LuLaRoe seller assisted marketing plan, LuLaRoe's business structure, and the attendant risks of becoming and staying a LuLaRoe Consultant, until after purchased a substantial inventory from

the Defendants, and until after she had made a significant investment into her LuLaRoe "business".

92.    McGurn relied on the misrepresentations of the Defendants and their agents in connection with her purchase of the LuLaRoe seller assisted marketing plan, and would not have become a LuLaRoe Consultant had the omitted material risks described above were fully disclosed to her. Further, McGurn would not have become a LuLaRoe Consultant when had she known that (i) there was a pattern and practice of encouraging inventory loading by "downline" Consultants by the Defendants and "upline" Consultants; (ii) that there were no protections in place for "downline" Consultants to prevent inventory loading or protect them from "inventory loading"; and (iii) that LuLaRoe was an endless chain scheme created and operated by the Defendants to enrich themselves and those at the top of the LuLaRoe organization.

93.    Defendants material omissions, and McGurn's ignorance of these material omissions, continued through at least October 2017. Defendants benefited from these material omissions they concealed the true nature of the LuLaRoe business opportunity, which served as an aid to induce McGurn into believing that this was a legitimate business opportunity. As a result of these material omissions, McGurn had no reason to believe that the LuLaRoe seller assisted marketing plan

was illegitimate, or an illegal endless chain scheme. McGurn ultimately purchased thousands of dollars of inventory from the Defendants which reaped the Defendants substantial profits.

94.    McGurn was also led to believe by Defendants and their agents that LuLaRoe was a seller assisted marketing plan, in that (i) Defendants advertised and otherwise represented to McGurn that for the purchase of more than $500 in LuLaRoe inventory that would be used by McGurn to start, maintain and operate her LuLaRoe "business" (ii) that McGurn could earn an amount in excess of her initial inventory purchase; (iii) that there was a market for LuLaRoe products purchased by McGurn from the Defendants; and (iv) that Defendants would buy back, or would likely buy back, in whole or in part, McGurn's initial LuLaRoe inventory purchase upon cancellation of McGurn's agreement with Defendants.

95.    McGurn was also led to believe by the Defendants and their agents that this seller assisted marketing plan included a marketing plan, along training and support for her in connection with her LuLaRoe "business". McGurn was led to believe that this marketing plan would include, but not be limited to, an initial sales and marketing plan, business assets (i.e. marketing materials), training calls, support from her sponsor and other "upline" Consultants, and opportunities to attend LuLaRoe sales conferences. McGurn reasonably believed that the marketing

plan provided by the Defendants and their agents would help her succeed in her LuLaRoe "business".

96.    Despite being a seller assisted marketing plan, McGurn was never informed that Defendants had failed to register its seller assisted marketing plan with the California Attorney General's Office. McGurn was never provided with any disclosures or any disclosure document as required by California Civil Code § 1812.200 *et seq*. McGurn's agreement with Defendants did contain the contractual terms required by California Civil Code § 1812.200 *et seq.*

97.    Between June 29, 2015 and May 2016, consistent with their "buy more, sell more" policy, Defendants and their agents constantly pressured McGurn to purchase more inventory notwithstanding the prospect of bona fide retail sales. McGurn reasonably believed that this inventory loading was consistent with the marketing plan that Defendants sold her, and was in her best interest. In other words, by reinvesting her profits in more inventory and continuing to purchase additional inventory, she reasonably believed that this would help drive retail sales. McGurn was ignorant to the fact that this inventory loading policy was actually a device to get lower level "downline" Consultants to purchase inventory so that Defendants and "upline" Consultants could profit at her expense. Ultimately

McGurn made a substantial investment – and reinvested her profits – into additional inventory which she was not able to sell.

98.    After a substantial investment of time, money, and effort into selling LuLaRoe products, McGurn ultimately concluded that it was too difficult to make money selling LuLaRoe products to end-user retail customers. This conclusion was based in part on the fact that there was a general oversaturation of LuLaRoe Consultants, and that there was an oversaturation of LuLaRoe products that were already sold to end-user retail customers. In other words, contrary to what she was led to believe, McGurn ultimately concluded that there was little or no natural market for LuLaRoe products. As a direct and proximate result of her reliance on the misrepresentations and omissions made by Defendants between July 2, 2016 through October 2017 as described above, McGurn has suffered actual damages that includes the unpaid credit card balance representing purchased inventory, out-of-pocket startup and operational expenses which she will not be able to recoup, and lost time and opportunity costs.

**Plaintiff Peggy Johnson**

99.    Plaintiff Peggy Johnson executed an Independent Consultant Program Application and Agreement with the Defendants on or about on November 30, 2016, and was approved as a Consultant sometime shortly thereafter. After she was

approved, Johnson placed an initial order with LuLaRoe of approximately $5,000, and invested approximately $1,500 in supplies for her "business". To finance the initial order and startup supplies, Johnson took money from her 401(k) retirement saving plan. Johnson had hoped to run her "business" along with her daughters.

100.   Defendants and their agents led her to believe that it would take approximately two months to breakeven on her investment in her LuLaRoe "business". Once she was formally approved as a Consultant, Defendants and her "upline" Consultants inundated her with the phrase "buy more, sell more", or words of similar import. Despite approximately a year of hard work and persistence, Johnson was unable to sell all the inventory that she purchased from LuLaRoe, and ultimately suffered a loss on her LuLaRoe "business". Johnson was ultimately stuck with unsaleable inventory which is sitting in her garage, and has suffered actual monetary losses as a direct and proximate result of becoming a Consultant with LuLaRoe. Despite the fact that Johnson suffered actual monetary losses, Defendants and Johnson's "upline" Consultants ultimately profited from Johnson's purchase of inventory from LuLaRoe.

101.   Immediately prior to Johnson executing the Application and Agreement, in November 30, 2016 in Boulder City, Nevada, when Defendants and their agents were selling the LuLaRoe business opportunity to Johnson, they had

affirmative duty to fully explain the LuLaRoe business opportunity (including the risks and potential rewards) to Johnson prior to her executing the Application and Agreement. On November 30, 2016, Defendants and their agents, falsely represented and implied that LuLaRoe was a legitimate business opportunity making false and misleading statements to Rocke such as "LLR is a direct sales company that markets its products through Independent Fashion Consultants" when in reality its enterprise structure met the definition of an illegal endless chain scheme. On November 30, 2016, Johnson relied on the misrepresentation that LuLaRoe was a legitimate business opportunity when she elected to execute her Application and Agreement to become a LuLaRoe Consultant. On November 30, 2016, Defendants and their agents omitted the following material facts in connection with their offer to sell the LuLaRoe seller assisted marketing plan to Johnson, including but not limited to the following:

> (1) that because "upline" bonus revenue was not calculated on retail sales, there was a pattern and practice within the LuLaRoe organization of encouraging "downline" Consultants to continue to purchase LuLaRoe inventory regardless of if they were making any retail sales (i.e. inventory loading);

(2) that incentivizing inventory loading was a mechanism for Defendants and "upline" Consultants to earn profits at the expense of "downline" Consultants;

(3) that Defendants had not implemented or enforced a 70% Rule or 10 Customer Rule to prevent inventory loading by Consultants, or otherwise protect "downline" Consultants from inventory loading;

(4) that the minimum monthly *sale* requirement of 33 units was enforced in practice as a minimum monthly *purchase* requirement of 33 units;

(5) that LuLaRoe when emphasized "leadership" as a virtue, Defendants true intent was to encourage existing Consultants to recruit new Consultants to build their "teams" so that Defendants could sell more wholesale inventory to new Consultants;

(6) that it was generally more lucrative for Consultants to focus on recruiting other Consultants and to receive monthly bonus payments under then Bonus Plan than it was focusing on making bona fide retail sales to end-user customers;

(7) that by aggressively recruiting new Consultants, that Defendants were oversaturating the market with LuLaRoe Consultants across the United States;

(8) that by oversaturating the market with LuLaRoe Consultants, end-user
interest in purchasing LuLaRoe products may decrease;

(9) that wholesale sales by the Defendants to the Consultants greatly
exceeded bona fide retail sales by Consultants to end-user retail
customers;

(10) that Defendants were operating LuLaRoe as an illegal endless chain
scheme created and operated by the Defendants to enrich themselves at
the expense of the Consultants; and

(11) that Defendants had willfully failed to register the LuLaRoe seller
assisted marketing plan with the California Attorney General's office.

102.    Defendants and their agents are and were under a continuing duty to disclose all
material facts regarding the LuLaRoe business opportunity while Johnson was a
Consultant with LuLaRoe. The aforementioned omissions were material to
Johnson, as she was unable to fully evaluate the LuLaRoe seller assisted marketing
plan, LuLaRoe's business structure, and the attendant risks of becoming and
staying a LuLaRoe Consultant, until after purchased a substantial inventory from
the Defendants, and until after she had made a significant investment into her
LuLaRoe "business".

103.   Johnson relied on the misrepresentations of the Defendants and their agents in connection with her purchase of the LuLaRoe seller assisted marketing plan, and would not have become a LuLaRoe Consultant had the omitted material risks described above were fully disclosed to her. Further, Johnson would not have become a LuLaRoe Consultant when had she known that (i) there was a pattern and practice of encouraging inventory loading by "downline" Consultants by the Defendants and "upline" Consultants; (ii) that there were no protections in place for "downline" Consultants to prevent inventory loading or protect them from "inventory loading"; and (iii) that LuLaRoe was an endless chain scheme created and operated by the Defendants to enrich themselves and those at the top of the LuLaRoe organization.

104.   Defendants material omissions, and Johnson's ignorance of these material omissions, continued through at least October 2017. Defendants benefited from these material omissions they concealed the true nature of the LuLaRoe business opportunity, which served as an aid to induce Johnson into believing that this was a legitimate business opportunity. As a result of these material omissions, Johnson had no reason to believe that the LuLaRoe seller assisted marketing plan was illegitimate, or an illegal endless chain scheme. Johnson ultimately purchased

thousands of dollars of inventory from the Defendants which reaped the Defendants substantial profits.

105.   Johnson was also led to believe by Defendants and their agents that LuLaRoe was a seller assisted marketing plan, in that (i) Defendants advertised and otherwise represented to Johnson that for the purchase of more than $500 in LuLaRoe inventory that would be used by Johnson to start, maintain and operate her LuLaRoe "business" (ii) that Johnson could earn an amount in excess of her initial inventory purchase; (iii) that there was a market for LuLaRoe products purchased by Johnson from the Defendants; and (iv) that Defendants would buy back, or would likely buy back, in whole or in part, Johnson's initial LuLaRoe inventory purchase upon cancellation of Johnson's agreement with Defendants.

106.   Johnson was also led to believe by the Defendants and their agents that this seller assisted marketing plan included a marketing plan, along training and support for her in connection with her LuLaRoe "business". Johnson was led to believe that this marketing plan would include, but not be limited to, an initial sales and marketing plan, business assets (i.e. marketing materials), training calls, support from her sponsor and other "upline" Consultants, and opportunities to attend LuLaRoe sales conferences. Johnson reasonably believed that the marketing

plan provided by the Defendants and their agents would help her succeed in her LuLaRoe "business".

107.    Despite being a seller assisted marketing plan, Johnson was never informed that Defendants had failed to register its seller assisted marketing plan with the California Attorney General's Office. Johnson was never provided with any disclosures or any disclosure document as required by California Civil Code § 1812.200 *et seq*. Johnson's agreement with Defendants did contain the contractual terms required by California Civil Code § 1812.200 *et seq*.

108.    Between November 30, 2016 and August 2017, consistent with their "buy more, sell more" policy, Defendants and their agents constantly pressured Johnson to purchase more inventory notwithstanding the prospect of bona fide retail sales. Johnson reasonably believed that this inventory loading was consistent with the marketing plan that Defendants sold her, and was in her best interest. In other words, by reinvesting her profits in more inventory and continuing to purchase additional inventory, she reasonably believed that this would help drive retail sales. Johnson was ignorant to the fact that this inventory loading policy was actually a device to get lower level "downline" Consultants to purchase inventory so that Defendants and "upline" Consultants could profit at her expense.

Ultimately Johnson made a substantial investment – and reinvested her profits –
into additional inventory which she was not able to sell.

109.   After a substantial investment of time, money, and effort into selling
LuLaRoe products, Johnson ultimately concluded that it was too difficult to make
money selling LuLaRoe products to end-user retail customers. This conclusion was
based in part on the fact that there was a general oversaturation of LuLaRoe
Consultants, and that there was an oversaturation of LuLaRoe products that were
already sold to end-user retail customers. In fact, the market was so oversaturated
that Johnson later learned that there were two other LuLaRoe Consultants on the
street that she lived on. In other words, contrary to what she was led to believe,
Johnson ultimately concluded that there was little or no natural market for
LuLaRoe products. As a direct and proximate result of her reliance on the
misrepresentations and omissions made by Defendants between July 2, 2016
through October 2017 as described above, Johnson has suffered actual damages
that includes unsaleable inventory, out-of-pocket startup and operational expenses
which she will not be able to recoup, and lost time and opportunity costs.
/ / /


# CLASS ACTION ALLEGATIONS

110.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of a Class consisting of:

> All current and former LuLaRoe Consultants from January 1, 2013 to present. Excluded from the class are the Defendants, their employees and family members. Also excluded from this matter are any judicial officers presiding over this mater and their immediate family members.

Excluded from the Class is any Consultant that reached the rank of Sponsor, Trainer, Coach, Mentor, or Leader, and each Defendant, their officers and directors, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which any Defendant has or had a controlling interest.

111.    This case may be appropriately maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure because all of the prerequisites set forth under Rule 23 (a) and 23(b) are met. The Plaintiffs further seek to pursue a private attorney general action for injunctive relief on behalf of the people of California, and they satisfy the applicable standing and class action requirements, as described herein.

112.    The proposed Class is so numerous that joinder of all members is impracticable. The exact number of class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, but is estimated to

exceed 5,000. The proposed class is ascertainable in that, upon information and belief, the names and addresses of all members of the Class can be identified in business records maintained by Defendants.

113.    Issues of law and fact common to the members of the Class predominate over any questions that may affect only individual members, in that Defendant has acted on grounds generally applicable to the entire Class. Among the issues of law and fact common to the Class are:

a)    Whether LuLaRoe was or is as an endless chain scheme under California law;

b)    Whether Defendants operated LuLaRoe as an endless chain scheme under California law;

c)    Whether the LuLaRoe business opportunity constituted a seller assisted marketing plan under California law;

d)    Whether Defendants sold a seller assisted marketing plan in violation of Cal. Civ. Code § 1812.200 *et seq.*;

e)    Whether Defendants or their agents made any material misrepresentations or omissions in connection with the sale of a seller assisted marketing plan as defined under California law;

f)      Whether Defendants or their agents gave Consultants the disclosures

regarding seller assisted marketing plans as required under Cal. Civ.

Code § 1812.200 *et seq.*;

g)      Whether Consultants contracts with the Defendants contained the

contract language required under Cal. Civ. Code § 1812.200 *et seq.*;

h)      Whether Defendants made misrepresentations and omitted material

facts in connection with the sale of the LuLaRoe seller assisted

marketing plan in violation of applicable common law principles;

i)      Whether Defendants conduct noted above constitute unfair

competition and/or false advertising in violation of Business and

Professions Code § 17200 *et seq.* and Section § 17500 *et seq.*;

j)      Whether Defendants conduct violated the implied covenant of good

faith and fair dealing inherent in every contract;

k)      Whether the members of the Class sustained damages by reason of

the uniform and patterned wrongful acts and omissions of the

Defendants and, if so, the proper measure of such damages.

114.    Plaintiffs' claims are typical of the claims of the members of the Class

because Plaintiffs and all claims of the members of the Class originate from the

same conduct, practice and procedure on the part of Defendants and Plaintiffs have

suffered the same injuries as each member of the Class. Plaintiffs have retained

counsel experienced and competent in class action litigation.

115.   A class action is superior to all other available methods for the fair

and efficient adjudication of this controversy, since joinder of all members is

impracticable. Furthermore, as the damages suffered by individual members of the

Class may be relatively small, the expense and burden of individual litigation make

it extremely difficult for the members of the Class to individually redress the

wrongs done to them. There will be no difficulty in the management of this action

as a class action.

## FIRST CAUSE OF ACTION
**Endless Chain Scheme: California Penal Code §327 and Section
1689.2 of the California Civil Code
(Against All Defendants)**

116.   Plaintiffs reallege and incorporate by reference all of the other

allegations as if set forth herein.

117.   Section 1689.2 of the California Civil Code provides:

A participant in an endless chain scheme, as defined in Section 327 of
the Penal Code, may rescind the contract upon which the scheme is
based, and may recover all consideration paid pursuant to the scheme,
less any amounts paid or consideration provided to the participant
pursuant to the scheme.

Defendants are operating LuLaRoe as an illegal endless chain scheme in violation

of California law.

118.   Plaintiffs and the class have suffered an injury in fact and have lost money or property because of Defendants operation of LuLaRoe an endless chain, business acts, omissions, and practices.

119.   Plaintiffs and the class are entitled to:

a) Rescind the contract upon which the scheme is based and recover all consideration paid under the scheme, less any amounts paid or consideration provided to the participant under the scheme;

b) Restitution, compensatory and consequential damages (where not inconsistent with their request for rescission or restitution); and

c) Attorneys' fees, costs, pre- and post-judgment interest.

## SECOND CLAIM FOR RELIEF
### Unfair and Deceptive Practices Claims Under Cal. Bus, & Prof. Code § 17200, *et seq.*
### (Against All Defendants)

120.   Plaintiffs reallege and incorporate by reference all of the other allegations as if set forth herein.

121.   Defendants are engaged in ongoing and continuous unlawful, unfair, and fraudulent business acts or practices, and unfair, deceptive, untrue and misleading advertising within the meaning of the California Business and Professions Code § 17200, *et seq*. The acts practices alleged herein constitute a

pattern of behavior, pursued as wrongful business practice that has victimized and continues to victimize thousands of Consultants nationwide.

122.    Pursuant to California Business and Professions Code § 17200, an "unlawful" business practice is one that violates California law. Defendants' business practices are unlawful because they involve the creation and promotion of an illegal pyramid scheme or endless chain scheme as defined under California law, and the promotion on of an unregistered seller assisted marketing plan under California law.

123.    Defendants are engaged in an illegal pyramid scheme or endless chain scheme as defined under California Penal Code § 327. Defendants utilize this illegal endless chain scheme with the intent, directly or indirectly to dispose of property, in the form of LuLaRoe products, and to convince Consultants to recruit others to do the same.

124.    Pursuant to California Business and Professions Code § 17200, an "unfair" business practice includes a practice that offends an established public policy, or that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers. Defendants' promotion and operation of an illegal pyramid scheme is unethical, oppressive and unscrupulous in that defendants are duping

consumers nationwide out of millions of dollars through their illegal pyramid scheme.

125.    Pursuant to California Business and Professions Code § 17200, a "fraudulent" business practice is one that is likely to deceive the public.

126.    Defendants' business practice is fraudulent in that they have deceived the public by misrepresenting the nature of their business. For example, Defendants have failed to inform the public that they are openly an illegal pyramid scheme, and promoting an unregistered seller assisted marketing plan. California citizens have relied, and continue to rely on defendants' misrepresentations and omissions to their detriment. Moreover, Defendants misrepresented facts about the amount of money that a Consultant would earn, including false statements about the amount of time in which Consultants could recoup their investment and become profitable.

127.    As a result of their unlawful, unfair and fraudulent acts, Defendants have reaped and continue to reap unfair benefits and illegal profits at the expenses of Plaintiffs and the class members.

128.    Defendants should be made to disgorge these ill-gotten gains and restore Plaintiffs and the Class the wrongfully taken revenue.

129.    Defendants' unlawful, unfair and fraudulent acts and/or omissions will not be completely and finally stopped without orders of an injunctive nature.

130.    Under California Business and Professions Code section 17203, Plaintiffs seek a judicial order of an equitable nature against all Defendants, including, but not limited to, an order declaring such practices as complained of to be unlawful, unfair, fraudulent and/or deceptive, and enjoining them from undertaking any further unfair, unlawful, fraudulent and/or deceptive acts or omissions related to operating the illegal pyramid scheme. Plaintiffs also seek restitution, disgorgement, and any other appropriate equitable relief.

### THIRD CLAIM FOR RELIEF
**California Business and Professions Code § 17500, *et seq*.**
**(Against All Defendants)**

131.    Plaintiffs reallege and incorporate by reference all of the other allegations as if set forth herein.

132.    Plaintiffs bring this cause of action on behalf of themselves and on behalf of all other LuLaRoe Consultants in the Class who signed an agreement with LuLaRoe.

133.    Defendants' business acts, false advertisements and materially misleading omissions constitute unfair trade practices and false advertising, in violation of the California Business and Professions Code§ 17500, *et seq*.

134.   Defendants engaged in false, unfair and misleading business practices, consisting of false advertising and materially misleading omissions likely to deceive the public and include, but are not limited to:

a)   Defendants failing to disclose to consumers that they were entering into an illegal endless chain scheme and purchased an unregistered seller assisted marketing plan;

b)   Defendants misrepresenting the money that a Consultant could earn with LuLaRoe;

c)   Defendants' marketing and promotion of the illegal endless chain scheme and unregistered seller assisted marketing plan constitutes misleading, unfair, and fraudulent advertising in connection with their false advertising to induce consumers to purchase products and join the illegal endless scheme. Defendants knew or should have known, in exercising reasonable care, that the statements they were making were untrue or misleading and deceived members of the public. Defendants knew or should have known, in exercising reasonable care, that distributors, including Plaintiffs, would rely, and relied on Defendants' misrepresentations and omissions.

135.    Because of Defendants' untrue and/or misleading representations, Defendants wrongfully acquired money from Plaintiffs and the Class to which it was not entitled.

136.    The Court should order Defendants to disgorge, for the benefit of Plaintiffs and the Class their profits and compensation and/or make restitution to Plaintiffs and the Class.

137.    Under California Business and Professions Code section 17535, Plaintiffs and the Class seek a judicial order directing Defendants to cease and desist with all false advertising related to the Defendants' illegal pyramid scheme and any such other injunctive relief as the Court finds just and appropriate. Plaintiffs also seek restitution, disgorgement, and any other appropriate equitable relief.

## FOURTH CLAIM FOR RELIEF
### Violations of the California Seller Assisted Marketing Plan Act § 1812.200 *et seq.*
### (Against All Defendants)

138.    Plaintiffs reallege and incorporate by reference all of the other allegations as if set forth herein.

139.    The LuLaRoe seller assisted marketing plan meets the definitions of a "seller assisted marketing plan" under the California Seller Assisted Marketing Plan Act, Cal. Civ. Code § 1812.200 *et seq*. and did not qualify for any exemptions

thereunder. Specifically, the LuLaRoe seller assisted marketing plan involved Defendants' sale or lease of product, equipment, supplies, and services for initial payment exceeding $500 to the Plaintiffs and the Class in connection with or incidental to beginning, maintaining, or operating their respective LuLaRoe businesses.

140.    From within California, Defendants individually and by and through their agents advertised and otherwise solicited the purchase or lease of product, equipment, supplies, and services to the Plaintiffs and the Class as alleged above.

141.    Defendants, individually and through its agents, (1) represented that the Plaintiffs and the Class members were likely to earn an amount in excess of the initial payment; (2) represented that there is a market for LuLaRoe products that were purchased by the Plaintiffs and the Class members; and (3) represented that LuLaRoe would, in whole or in part, buy back or is likely to buy back the LuLaRoe product initially sold to the Plaintiffs and the Class members.

142.    Defendants also represented or implied that they have sold the LuLaRoe seller assisted marketing plan to at least five (5) other individuals in the previous 24 months, and intend to sell the LuLaRoe seller assisted marketing plan to at least five (5) individuals in the next 12 months.

143.    Defendants are sellers of "Seller Assisted Marketing Plans", as defined in Cal. Civ. Code § 1812.201(d).

144.    The Defendants did not provide the Plaintiffs or the Class members a Disclosure Document or an Information Sheet as required by Cal. Civ. Code §§ 1812.205 and 1812.206. Furthermore, the LuLaRoe business opportunity contracts did not meet the substantive requirements of Cal. Civ. Code § 1812.209. Nor was the LuLaRoe seller assisted marketing plan registered in California as required by Cal. Civ. Code § 1812.203.

145.    As more fully alleged above, Defendants, individually and through their agents, made earnings and market representations to the Plaintiffs and the Class without the substantiating data or disclosures required by Cal. Civ. Code § 1812.204. The representations were fraudulent in violation of Cal. Civ. Code §§ 1812.201 and 1812.204.

146.    The Defendants' sale of an unregistered "Seller Assisted Marketing Plan" from the state of California entitles the Plaintiffs and the Class to their actual damages, attorneys' fees, rescission of the agreements at issue, and punitive damages pursuant to Cal. Civ. Code §§ 1812.215 and 1812.218.

147.    The Defendants' disclosure violations entitle Plaintiffs and the Class to their actual damages, attorneys' fees, rescission of the agreements at issue, and punitive damages pursuant to Cal. Civ. Code §§ 1812.215 and 1812.218.

148.    The Defendants' anti-fraud violations entitle the Plaintiffs and the Class to recover their damages pursuant to Cal. Civ. Code §§ 1812.215 and 1812.218.

## FIFTH CLAIM FOR RELIEF
### Common Law Fraud and Misrepresentation
### (Against All Defendants)

149.    Plaintiffs reallege and incorporate by reference all of the other allegations as if set forth herein.

150.    Prior to purchasing the LuLaRoe seller assisted marketing plan and becoming a LuLaRoe consultant, Defendants intentionally made misrepresentations of material facts and concealed true material and qualifying facts from Consultants as alleged above.

151.    The Defendants' false representations concerned then-existing material facts. Defendants knew at the time that these representations were false. Defendants' made these misrepresentations and omissions with the intent to induce Consultants to rely on them and to purchase the LuLaRoe seller assisted marketing plan, and to become a LuLaRoe Consultant. When Defendants chose to speak and

make the various representations on the subject matter of the LuLaRoe business opportunity, they were duty bound to disclose all qualifying materials facts. Defendants did not disclose the material facts to the Consultants but instead concealed them.

152.   The Consultants were ignorant of the falsity of Defendants' misrepresentations and could not in the exercise of reasonable diligence have discovered Defendants' misrepresentations and omissions because only Defendants possessed that information. In justified reliance on Defendants' representations and omissions, the Consultants purchased the LuLaRoe seller assisted marketing plan, became Consultants, and paid substantial sums to Defendants. Had the Consultants known of the falsity of Defendants' representations or known of the omitted material facts, they would not have entered into the subject contracts.

153.   As a direct and proximate result of Defendants' fraud, the Consultants were damaged by paying money to the Defendants. The Consultants are entitled to compensatory damages in a sum in an amount according to proof. Alternatively, the Consultants are entitled to rescission of the subject contracts, restitution, and ancillary damages according to proof.

154.   Defendants further acted with oppression, fraud, and malice, and in conscious disregard of the Consultants' rights entitling the Consultants to exemplary damages in an amount according to proof.

## SIXTH CLAIM FOR RELIEF
### Unjust Enrichment
### (Against All Defendants)

155.   Plaintiffs reallege and incorporate by reference all of the other allegations as if set forth herein.

156.   As a result of Defendants' wrongful and fraudulent conduct, the Plaintiffs and all of the members of the Class have conferred benefits upon Defendants.

157.   Defendants were at all relevant times aware that the benefits conferred upon them by the Consultants were the result of fraud and misrepresentation.

158.   Allowing Defendants to retain these unjust profits and other benefits would offend traditional notions of justice and fair play. Under these circumstances, it would be inequitable for Defendants to retain the benefits and allowing them to do so would induce companies to make misrepresentations to increase sales.

159.   Defendants are in possession of funds that were wrongfully obtained from Consultants and such funds should be disgorged as ill-gotten gains.

## SEVENTH CLAIM FOR RELIEF
### Breach of Implied Covenant of Good Faith and Fair Dealing
### (Against All Defendants)

160.    Plaintiffs reallege and incorporate by reference all of the other allegations as if set forth herein.

161.    The Plaintiffs and the Class had certain contractual rights under their agreements with Defendants. The Plaintiffs and the Class performed their obligations under all such agreements; however, as more fully described above, unfairly and in bad faith interfered with the Plaintiffs' and the Class' right to receive their benefit of the bargain under the agreements.

162.    As a direct and proximate result of Defendants' conduct, the Plaintiffs and the Class has damaged, and is entitled to compensatory damages, and any other and further relief as is just and equitable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the Class respectfully requests the following relief against Defendant:

A.    That this action be certified as a class action on behalf of the Class and Plaintiffs and their counsel be appointed as the representatives of the Class;

B.    A jury trial and judgment against the Defendants;

C.    Rescission of the agreements upon which the scheme is based, and recovery of all consideration paid pursuant to the scheme, less any amounts paid or consideration provided to the participant pursuant to the scheme;

D.    Compensatory damages in an amount according to proof;

E.    Damages for the financial losses incurred by Plaintiffs and by the Class of the Defendants conduct and for injury to their business and property;

F.    A declaration invalidating the agreements the Plaintiffs and the Class entered into with the Defendants found to be unconscionable, illegal and void as a matter of public policy;

G.    Restitution and disgorgement of the illegal profits Defendants earned as a result of this scheme;

H.    Reasonable attorneys' fees and costs under California Code of Civil Procedure § 1021.5, Civil Code §1689.2, Civil Code § 1812.218, and as otherwise by law.

I.    For punitive damages against each Defendant;

J.     Permanent injunctive relief enjoining Defendants' sale of unregistered seller assisted marketing plans or business opportunities, and misleading advertising;

K.     Permanent injunctive relief enjoining Defendants from paying any recruiting rewards that are unrelated to retail sales to ultimate users and from further unfair, unlawful, fraudulent and/or deceptive acts; and

L.     Any other relief that the Court deems just and equitable.

## **DEMAND FOR JURY TRIAL**

Plaintiffs and the Class demand a trial by jury on all claims so triable.

RESPECTFULLY SUBMITTED,

Dated: November 30, 2017          By:/s/ Joshua B. Kons


LAW OFFICES OF JOSHUA B. KONS, LLC
Joshua B. Kons
939 West North Avenue, Suite 750
Chicago, IL 60642
Tel: 312-757-2272
Fax: 312-757-2273
Email: joshuakons@konslaw.com


*Attorney for Plaintiffs and the Proposed Class*